734 P.2d 762

Bernie and Elena CANO,
Plaintiffs-Appellees-Cross-Appellants,

v.

Placido LOVATO, Defendant-Third-Party Plaintiff-Appellant-Cross-Appellee,

v.

ESTATE OF Niven S. ROBINSON, et al.,
Third-Party Defendants-Fourth-Party Plaintiffs-Appellants,

v.

NEW MEXICO TITLE COMPANY,
Fourth-Party Defendant-Appellant.

Nos. 7915, 7926.

Court of Appeals of New Mexico.

April 29, 1986.

Certiorari Denied June 24, 1986,
(N.M. Title and Estate of Robinson).

Certiorari Quashed March 12, 1986
(Cano).

Linda R. Bonnefoy, Daniel J. Herbison, Albuquerque, for plaintiffs-appellees cross-appellants Bernie and Elena Cano.

Earl R. Norris, Oldaker & Oldaker, Albuquerque, for defendant-third-party plaintiff-appellant-cross-appellee Placido Lovato and fourth-party defendant-appellant New Mexico Title Co.

Katherine C. Pearson, Johnson & Lanphere, P.C., Albuquerque, for third-party defendants fourth-party plaintiffs-appellants Estate of Niven S. Robinson, et al.

## OPINION

ALARID, Judge.

This case is a quiet title action brought by Bernie and Elena Cano (the Canos) against Placido Lovato (Lovato). Lovato joined the Estate of Niven R. Robinson (the Estate) in the action, and the Estate joined New Mexico Title Company (N.M. Title). The trial court quieted title in the Canos, and granted other forms of relief to Lovato and the Estate. Lovato, the Estate, and N.M. Title appeal from that portion of the

judgment quieting title in the Canos, and the Canos cross-appeal from that portion of the judgment granting Lovato a lien against the subject property. The Estate and N.M. Title also appeal various other rulings of the trial court. The specific positions on appeal are as follow:

(1) Lovato and the Estate challenge the validity of the tax sale at which the Canos bought the property;

(2) Lovato and the Estate challenge the trial court's refusal to find superior title in Lovato as a good faith purchaser;

(3) Lovato and the Estate challenge the constitutional adequacy of notice of the tax sale;

(4) N.M. Title challenges the trial court's conclusion that it was negligent as an agent for the Estate;

(5) the Estate challenges its measure of damages granted by the trial court;

(6) the Canos challenge the trial court's imposition of an equitable lien on the property in favor of Lovato; and

(7) the Canos challenge the amount of the lien.

We remand for a fact-finding under issue (2), involving the good faith purchaser. We conditionally affirm the other issues on appeal, however, because, depending on the outcome under issue (2), they could reappear as issues for decision. We first outline the facts and various procedural matters. We then address the issues as presented in the above sequence.

**FACTS**

The residential property in question is located in Albuquerque, in Bernalillo County. On July 8, 1980, Lovato signed a purchase agreement with the Estate to purchase the property, along with a single trailer on the property, from the Estate. Niven Robinson died in 1979, and his wife died in 1978. The Estate was administering the property. On August 1, 1980, Lovato took possession of the land, and made various improvements on the land. Pursuant to the purchase agreement, on September 30, 1980, the Estate and Lovato entered into a real estate contract. The Estate had signed the contract earlier in September, but Lovato signed the contract and tendered a down payment on September 30. The contract price was $28,000.00; Lovato made a down payment of $12,000.00, leaving a principal balance of $16,000.00 at 8% interest.

The real property taxes on the property remained unpaid for the years 1976, 1977, 1978 and 1979. Lovato's purchase of the property was conditioned upon proration of the 1980 taxes, together with payment by the Estate of any delinquent taxes, penalties and interest. However, there was no requirement that any such taxes be paid prior to closing.

The Estate retained N.M. Title to secure a title insurance policy for the property, and to act as closing agent for the transaction between the Estate and Lovato. On July 23, 1980, an employee of N.M. Title performed a tax search of the property at the Bernalillo County Treasurer's office and discovered the delinquency in the property taxes. This information was forwarded to N.M. Title. N.M. Title did not inform the Estate or Lovato of the delinquent taxes, nor did N.M. Title make any inquiry of the New Mexico Property Tax Division (Division) in Santa Fe as to the possibility of a tax sale to collect payment of back taxes.

The tax "account" on the property was transferred to the Division for collection sometime prior to September 30, 1980. Pursuant to statute, notice of the pending tax sale was published on August 22, 1980, and notice of the sale was sent by certified mail to "Robinson, Niven, Etux [sic], 4217 4th St., NW, Albuquerque, NM 87107." No notice was mailed or otherwise given to Lovato, who, at the time, had no recorded interest in the property. The notice was returned to the Division with a notation that the taxpayer, Robinson, did not reside at the address shown. The address was derived from the current property tax schedule.

On September 30, 1980, the same day the real estate contract was executed by Lovato, the Division conducted a sale of the property. The Canos were the successful bidders for the property, paying $1,900.00,

which included delinquent taxes, penalties and interest. The Canos were given a receipt for the property on September 30, and the Division executed a tax deed on that date. The deed was not physically delivered to the Canos until approximately one month after the sale.

On September 29, 1980, a second tax search was updated by N.M. Title, at which time the notation, "transferred to P.T.D. for collection", appeared on the tax receipt (tax bill) and tax rolls in the County Treasurer's office. The tax searcher took no action in response to this information. Subsequently, on October 3, 1980, the real estate transaction was closed when the Estate approved, and signed, the "Seller's Closing Statement" provided by N.M. Title. This closing statement reflected the outstanding delinquent taxes. Pursuant to the agreement between the parties and N.M. Title, sufficient money was withheld from the closing for the payment of any delinquent taxes. On or about October 9, 1980, N.M. Title attempted to pay such taxes, and discovered that a sale of the property was conducted to satisfy the delinquent *ad valorem* taxes. N.M. Title then returned this money to an escrow account set up for the transaction. N.M. Title, pursuant to its duties as closing agent, also recorded the real estate contract with the Bernalillo county clerk on October 9, 1980.

The Canos received a tax deed executed on September 30, on or about November 1, 1980 and recorded this deed on November 7, 1980, with the County Clerk.

Lovato remained in possession of the property and had no notice of any adverse claims to the property until early October, 1981, shortly after the Canos filed a complaint in forcible entry and detainer in Bernalillo County Metropolitan Court. By agreement of the parties, the action was dismissed and refiled as a quiet title action in the district court on February 12, 1982. Subsequently, the Estate and N.M. Title were joined in the litigation.

After trial on the merits, the court entered findings of fact and conclusions of law on March 23, 1984, and a judgment on March 23, 1984. The judgment, in pertinent part, directed that: (1) the Canos held superior title to Lovato and the Estate; (2) Lovato was to vacate the property on or before April 1, 1984; (3) Lovato was awarded a lien against the property, based on the improvements placed thereon, in the amount of $37,500.00, subject to offset for the rental value of the property during Lovato's possession; (4) Lovato was given the right, at his option, to remove certain improvements from the property at his expense; (5) the real estate contract between Lovato and the Estate was rescinded; (6) the Estate and N.M. Title would reimburse Lovato for the money he paid under the contract, including the down payment, and installment payments, with interest; and (7) the Estate was to be indemnified and held harmless by N.M. Title for any sums due Lovato. From this judgment, Lovato, N.M. Title, and the Estate appeal, and the Canos cross-appeal.

**PROCEDURAL MATTERS**

We note, initially, that subsequent to the original findings, conclusions and judgment, "supplemental" findings and conclusions, and a "supplemental" order (judgment) were filed on May 29, 1984. These reflect various additions to the originals, and the parties often refer to this supplemental set in their arguments. Motions to amend the judgment, and the findings and conclusions were timely filed by Lovato and the Canos on April 2, 1984. However, these motions were deemed denied when not ruled upon by May 2, 1984, NMSA 1978, Section 39-1-1, and the court was, therefore, without authority to enter the supplemental findings and order on May 29. We do not consider them for purposes of the appeal.

Secondly, Niven Robinson was a named defendant in a prior quiet title action filed by the Canos. A default judgment was entered in Bernalillo County District Court, on September 16, 1981, against Niven Robinson or his unknown heirs. The parties on appeal do not contend that the Estate was foreclosed from arguing the issue of the validity of the Canos' title, nor did the trial court foreclose the Estate. We assume,

but do not decide, that the Estate could properly contest the validity of the Canos' title in this action.

Thirdly, the Estate argues at the beginning of its brief-in-chief that a remand is proper, with directions to the trial court to "take evidence on the sufficiency of notice and procedure for the tax sale to the Canos." The remand is proper, argues the Estate, because the trial court granted the Canos' motion for summary judgment on the superiority of the Canos' title before the Estate was made a party to the litigation. Consequently, the argument continues, the Estate was foreclosed from presenting evidence on the sufficiency of notice of the tax sale, which relates to the issue of the validity of the tax deed.

We disagree. The record discloses that the Canos filed a similar motion for summary judgment against the Estate after the Estate was joined. On October 5, 1982, the court ordered that the motion was premature and would be taken under advisement *pending the completion of discovery.* The issue was nominally then foreclosed on October 17, 1983, when it was not reserved as an issue at trial in the pretrial order. The Estate, however, *was* free to conduct additional discovery on the issue it now claims was foreclosed to it. More significantly, the trial court, in fact, did not foreclose the issue of superior title at the trial on the merits, conducted on December 5, 1983. When the issue of superior title was raised again by Lovato's counsel at trial, the court stated that "the Court's chance of reconsidering are mighty slim" but that the court would hear evidence on the issue. Counsel for the Estate made no motion for a continuance at that point in order for time to prepare additional evidence. Nevertheless, evidence was introduced regarding notice to Lovato, which, the Estate agrees, was relevant to the superiority of title. The findings and conclusions subsequently entered reflect the evidence adduced at trial. No remand will, therefore, be ordered for the taking of additional evidence on notice.

## ISSUES ON THE APPEAL
## I. SUPERIORITY OF TITLE

### A. Validity of Tax Sale and Issuance of Tax Deed

Lovato and the Estate argue, first, that the tax sale to the Canos was defective, thereby invalidating the Canos' title. They base this argument on the fact that the deed to the Canos was delivered to the Canos approximately one month after the tax sale. They challenge the conclusions of the trial court as to this matter. The trial court concluded: 1) that the Canos, by virtue of the tax deed, held superior title to Lovato and the Estate; and 2) that the tax sale and delivery of the deed were "valid and properly conducted in substantial compliance with applicable New Mexico law." We address this issue notwithstanding the resolution of the following issue relating to good faith purchaser.

The applicable statutory section involved is NMSA 1978, Section 7–38–70 (Repl. Pamp.1983), which provides:

A. Upon receiving payment for real property sold for delinquent taxes, the division shall execute and deliver a deed to the purchaser.

B. If the real property was sold substantially in accordance with the Property Tax Code [Articles 35 to 38 of Chapter 7 NMSA 1978], the deed conveys all of the former property owner's interest in the real property as of the date the state's lien for real property taxes arose in accordance with the Property Tax Code, subject only to perfected interests in the real property existing before the date the property tax lien arose.

C. After two years from the date of sale, neither the former real property owner shown on the property tax schedule as the delinquent taxpayer nor anyone claiming through him may bring an action challenging the conveyance.

D. Subject to the limitation of Subsection C of this section, in all controversies and suits involving title to real property held under a deed from the state issued under this section, any person claiming title adverse to that acquired by the deed

from the state must prove, in order to defeat the title, that:

(1) the real property was not subject to taxation for the tax years for which the delinquent taxes for which it was sold were imposed;

(2) the division failed to mail the notice required under Section 7–38–66 NMSA 1978 or to receive any required return receipt;

(3) he, or the person through whom he claims, had title to the real property at the time of the sale and had paid all delinquent taxes, penalties, interest and costs prior to the sale as provided in Subsection E of Section 7–38–66 NMSA 1978; or

(4) he, or the person through whom he claims, had entered into an installment agreement to pay all delinquent taxes, penalties, interest and costs prior to the sale as provided in Section 7–38–68 NMSA 1978 and that all payments due were made timely.

This section is a portion of the new Property Tax Code (Code), NMSA 1978, Sections 7–35–1 to 7–38–93 (Repl.Pamp.1983 and Cum.Supp.1985). The Code was enacted originally in 1973, 1973 N.M.Laws, ch. 258, and repealed the former act, which was codified, in part, at NMSA 1953, Repl.Vol. 10 (1961), Sections 72–8–1 to –52. *See* ch. 258, § 156. Both the new and old statutes deal with the sale of property for delinquent taxes. Central to the old act was a right of redemption vested in the property owner, which permitted the owner to reacquire property sold for delinquent taxes to the state by the county treasurer. §§ 72–8–1 and –9. Under this act, the first sale that occurred was a sale to the state from the county treasurer. *Id.* The period of redemption ran two years from the date of sale, Section 72–8–9, and the state and its grantees were not entitled to possession of the property until that period had expired. § 72–8–5. Upon expiration of the redemption period, the county treasurer was required to execute tax deeds to the state for all unredeemed property, and any unredeemed properties were to be administered by the state tax commission for the benefit of the state. § 72–8–15. Included in the tax commission's power was the ability to offer the property for sale, Section 72–8–28, subject to the owner's right of repurchase. § 72–8–31. All of these provisions were conceived in accord with the intention underlying the act: to provide a method "whereby persons who have lost title to property through sale of the same to the state for delinquent taxes may repurchase such property and recover the title thereto without undue hardship and whereby the state and its subdivisions may receive their proper revenue * * *." § 72–8–44.

The new code, conversely, eliminated the right of redemption, the right of repurchase, and the initial transfer of the property from the county treasurer to the state. Once a sale is conducted of the taxpayer's property by the Division, Sections 7–38–65 to –70, payment by the tax sale purchaser is to be made "in full by the close of the public auction before an offer may be deemed accepted by the division." § 7–38–67(F). The deed conveyed to the purchaser upon receipt of payment, Section 7–38–70(A), is not subject, under the terms of Section 7–38–70(B)–(D), to a right of redemption or repurchase. The statutory language, reflecting the legislative intent, makes the sale final, subject only to the challenges enumerated in Section 7–38–70(D). These challenges are, generally, the only permissible methods for attacking the validity of the sale and deed. They represent the "curative feature" of the new code, which is a continuation of the "curative feature" of the old. *See Wine v. Neal,* 100 N.M. 431, 671 P.2d 1142 (1983). "This curative feature ... stands out conclusively against any technical objection to a tax title." *Maxwell v. Page,* 23 N.M. 356, 365, 168 P. 492 (1917). The curative policy is, and always has been, an attempt "to clothe tax titles with a measure of certainty and security." *Bailey v. Barranca,* 83 N.M. 90, 92, 488 P.2d 725 (1971). Lovato and the Estate agree that these challenges are not available in this case. Lovato and the Estate argue that the failure to immediately execute and deliver a deed at the tax sale on September 30, 1980, amounts to a jurisdictional defect, which was an exception

not "cured" by the curative provisions under the old code. *Pace v. Wight*, 25 N.M. 276, 181 P. 430 (1918).

We note, however, that the deed bears an execution date of September 30, and so it is only true that the deed was not delivered on that date. A jurisdictional defect "partakes of the nature of an essential of taxation", *Williams v. Van Pelt*, 35 N.M. 286, 289, 295 P. 418 (1930), and has been found where there was a failure to conduct a sale, *Pace*; a failure to sufficiently describe and identify the property in a tax assessment, *Manby v. Voorhees*, 27 N.M. 511, 203 P. 543 (1921); and where a county treasurer assigned a tax sale certificate and issued a deed to a purchaser after his authority to act under the statute had expired, *Werner v. Garcia*, 57 N.M. 249, 257 P.2d 929 (1953). Lovato and the Estate assert that the validity of the sale is dependent upon the immediate execution and delivery of the deed to the Canos. Without execution and delivery on September 30, 1980, they argue, there could be no valid conveyance of the property on that date, *see Den-Gar Enterprises v. Romero*, 94 N.M. 425, 611 P.2d 1119 (Ct.App.1980), which, they claim, amounts to a jurisdictional defect. Neither party contends that the requirements leading up to the sale, nor the requirement that payment shall be made in full, were not met under Sections 7–38–66 and –67.

■ We agree that a jurisdictional defect constitutes a proper challenge under the new code. *Pace* established the following requirements "essential to constitute a valid exercise of the taxing power, without which no tax sale could be validly made": (1) the necessity that a tax has been levied; (2) the property sold is subject to taxation; (3) the property has been assessed; (4) the taxes have not been paid; (5) the existence of a statutory directive for the sale; and (6) a sale made under such directive. 25 N.M. at 280, 181 P. 430. *Manby* added the requirement that any tax assessment must sufficiently describe the property so as to identify the property subject to taxation. 27 N.M. at 526, 203 P. 543. Based on the record, we find no jurisdictional defect existing at the time the purchase price was transmitted to the Division by the Canos. In order to set aside the tax deed, therefore, Lovato and the Estate must demonstrate that the Division proceeded to issue the tax deed without authority of law, under *Werner*.

In *Werner*, under the 1941 code, a county treasurer assigned a tax sale certificate to a party and subsequently issued a deed to the party more than two years after the period of redemption had expired. *See* NMSA 1941, §§ 76–611 and –724. That code required the assignment to be made *before* the expiration of the two-year redemption period, Section 76–711, and, where not assigned, required the treasurer to execute a tax deed to the state "immediately upon" the expiration of the period. § 76–724. The supreme court held that the tax deed to the party was void "for the reason that the county treasurer was without authority to assign the tax sale certificate issued [originally] to the State, and upon which the deed issued, after the period of redemption had expired." *Werner*, 57 N.M. at 253, 257 P.2d 929.

■ The only directive, however, in the new code is contained in Section 7–38–70(A): "*Upon* receiving payment for real property * * * the division shall execute and deliver a deed to the purchaser." (Emphasis added.) No definite time period is set out for the issuing of the deed. Absent any clear indication to the contrary, the words of the statute are to have their ordinary and usual meaning. *Perea v. Baca*, 94 N.M. 624, 614 P.2d 541 (1980). "Upon" means "with little or no interval after." *Webster's New International Dictionary* 2800 (2d ed. 1953). We presume that had the legislature intended to use the word "immediately," as it had done in Section 76–724 of the 1941 code, or to otherwise prescribe a specific time limitation, it would have done so. *See Bettini v. City of Las Cruces*, 82 N.M. 633, 485 P.2d 967 (1971). Because the statute does not mandate immediate delivery at the time of sale, we conclude, on these facts, that the deed was issued pursuant to statutory authority, and that the sale and deed may not be invalidat-

ed on the basis of a claimed jurisdictional defect.

Lovato and the Estate further argue, under this section, that the delivery of the tax deed in November 1980 operated as a constructive fraud on Lovato. Constructive fraud is a breach of legal or equitable duty, which the law declares to be fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. *Worman v. Echo Ridge Home Cooperative, Inc.*, 98 N.M. 237, 647 P.2d 870 (1982). They contend that an immediate delivery of the deed to the Canos would have led the Canos to record the deed before October 9, 1980, the date the real estate contract was recorded. This record notice to N.M. Title would have then prevented their recording of the contract. Lovato claims that any interest he had in the property was sold without record notice to him as a result of this "fraud". We reject this argument. The subsequent delivery of the deed is a separate concept from any record notice due Lovato prior to the tax sale, which is discussed in Point C. Moreover, we cannot find a breach of statutory duty which Lovato claims gives rise to the fraud. The deed, as we have concluded, was issued under statutory authority. No constructive fraud was practiced upon Lovato.

### B. Applicability of the Recording Act

Lovato requested a conclusion that he held superior title as a good faith purchaser, entitled to the protection of the New Mexico Recording Act, NMSA 1978, Section 14–9–3 (Act). The court refused this conclusion in its original findings and conclusions. Lovato and the Estate, on appeal, argue that Lovato has superior title because he was a purchaser who recorded the real estate contract without knowledge of the tax sale and tax deed. Lovato and the Estate rely upon the Act, which provides:

No deed, mortgage or other instrument in writing, not recorded in accordance with Section 14–9–1 NMSA 1978, shall affect the title or rights to, in any real estate, of any purchaser, mortgagee in good faith or judgment lien creditor, without knowledge of the existence of such unrecorded instruments.

The Act is designed to protect the title of a subsequent innocent purchaser for value without notice of an unrecorded deed. *Jeffers v. Martinez*, 93 N.M. 508, 601 P.2d 1204 (1979). "An innocent purchaser without notice of an unrecorded deed can do nothing to protect his position except to place his reliance upon the law as stated in Section 14–9–3." 93 N.M. at 510, 601 P.2d 1204.

The Act undoubtedly applies to tax deeds. The plain language of the Act makes no exception for tax deeds. A tax deed, under Section 7–38–70(B), conveys the former property owner's interest; in this regard, the tax deed is similar to other types of deeds which come under the Act. *See Doyle v. Lazarro*, 33 A.D.2d 142, 306 N.Y.S.2d 268 (1970). Moreover, to exclude a tax deed from operation of the Act would leave the subsequent innocent purchaser with "nothing to protect his position," *Jeffers*, which would be inequitable.

The Act embraces a "deed, mortgage or other instrument in writing." Here, an instrument in writing does exist, giving rise to Lovato's claim under the Act, because the Division executed a tax deed on September 30 naming the Canos as grantees. The executed deed reflected the Canos completed purchase of the property on September 30. Given the existence of this "instrument," we turn to the question of whether Lovato was a purchaser for value without knowledge of its existence.

The Act is designed to "prevent injustice by protecting innocent purchasers for value * * * who have invested money in property." *Jeffers v. Doel*, 99 N.M. 351, 353, 658 P.2d 426, 428 (1982); *Arias v. Springer*, 42 N.M. 350, 78 P.2d 153 (1938). Lovato executed the contract and obligated himself to pay the purchase price. Under the contract, he acquired equitable interest in the property, and he is treated as the owner of the property. *See Marks v. City of Tucumcari*, 93 N.M. 4, 595 P.2d 1199 (1979). Lovato was a purchaser for value.

■ Our Act is a "notice" provision. A subsequent purchaser prevails over an owner if, at the time the purchaser acquires an interest in the property, the owner's deed is unrecorded and the purchaser has no knowledge of the unrecorded instrument. *Angle v. Slayton*, 102 N.M. 521, 697 P.2d 940 (1985). Lovato acquired his interest in the property at the time he and the Estate entered into the contract. *J.C. Penney Co., Inc. v. Koff,* 345 So.2d 732 (Fla. App.1977); *Skendzel v. Marshall,* 261 Ind. 226, 301 N.E.2d 641 (1973). The representatives of the Estate had signed the contract earlier in September. Lovato executed the contract on September 30, at which time he tendered a check for the down payment to N.M. Title. N.M. Title did not release these funds to the Estate until October 3. The funds were not released until the Estate signed the "Seller's Closing Statement" prepared by N.M. Title. The statement, in part, authorized N.M. Title to pay delinquent taxes, recording fees, and various escrow fees to the holder of the contract deeds, First National Bank in Albuquerque, and to itself. It is not determinative, however, that the Estate did not have possession and use of the money until after September 30. The consideration essential to the validity of the real estate contract is not dependent on the payment of the purchase price, or any portion thereof, at the time the contract is executed. *Craigmile v. Sorenson,* 239 Minn. 383, 58 N.W.2d 865 (1953); *Cowman v. Allen Monuments, Inc.,* 500 S.W.2d 223 (Tex.Civ.App.1973). "The mutual promises [contained in the executed contract]—one by the seller to sell and one by the buyer to buy and pay for the land—are sufficient consideration to make the contract binding." *Id.* at 227. We conclude that Lovato was a purchaser for value on September 30, 1980, at which time the mutual promises of the parties had been given.

■ The Canos argue, with regard to the question of knowledge, that N.M. Title, as closing agent for Lovato, should have known of the pending tax sale and subsequent tax purchase, and that this "constructive knowledge" of N.M. Title is attributable to Lovato because of the agency relationship. We disagree. It is, first, not disputed that Lovato had no actual knowledge of the tax sale and deed until late in 1981. Secondly, the Canos overlook the specific circumstances of this case, where N.M. Title was in possession of facts which made the Lovato-Estate real estate transaction adversarial. As more fully discussed in Section II, N.M. Title knew that the property had been transferred for collection to the Division, and that this transfer could result in a tax sale. Such sale would naturally call into question the Estate's warranties under the real estate contract. Lovato, in fact, later claimed a breach of the contract by the Estate. Where, as here, the agent, N.M. Title, had knowledge of facts which made the transaction adversarial, but failed to disclose those facts so that the principal, Lovato, could make a fully-informed decision regarding his continuing participation in the transaction, N.M. Title's undisclosed knowledge is not to be imputed to Lovato. *C.B. & T. Co. v. Hefner,* 98 N.M. 594, 651 P.2d 1029 (Ct. App.1982). Lovato was thus without notice of delinquent taxes, the tax sale, and the resulting deed.

We are unable to determine, from the record, which party purchased the property first on September 30. This is important, of course, because Lovato is protected from a written instrument that is unrecorded *at the time of his acquisition. Angle.* If he purchased after the Canos purchased at the tax sale, he is protected against the unrecorded tax deed that was executed upon the receipt of the Canos' purchase money. If, however, he purchased before the tax sale to the Canos, we must determine whether he is protected against any other prior interest in the property.

There is no dispute that the property was encumbered by a statutory tax lien. The lien attached to the property on January 1, 1976, the year of the first unpaid tax. Section 7–38–48 provides for the creation and attachment of the lien:

Taxes on real property are a lien against the real property from January 1 of the tax year for which the taxes are imposed. The lien runs in favor of the

state and secures the payment of taxes on the real property and any penalty and interest that becomes due. The lien continues until the taxes * * * are paid. The lien created by this section is a first lien and paramount to any other interest in the property, perfected or unperfected.

Under the language of this section, the lien is created, and attaches, independent of any written instrument. It arises by operation of law. Unlike other kinds of tax liens, *see* NMSA 1978, Sections 7–1–37 and –38 (Repl.Pamp.1983), a lien under Section 7–38–48 is not dependent upon a filing of notice of lien for its creation and effect against purchasers. *See* NMSA 1978, §§ 7–1–2 and –3 (Repl.Pamp.1983 and Cum. Supp.1985); *Lovelace Center for Health Sciences v. Beach,* 93 N.M. 793, 796, 606 P.2d 203 (Ct.App.1980). Because such a lien is not a written instrument, we fail to see how it is embraced by the Act, which applies, by its terms, to instruments in writing.

Support for our conclusion and a discussion of its ramifications are found in *Roby v. Baker,* 78 A.D.2d 918, 432 N.Y.S.2d 917 (1980). The plaintiff in *Roby* commenced a quiet title action against defendant. Plaintiff purportedly purchased the property from the prior owner in 1973. Plaintiff then recorded a deed in 1973. At the time plaintiff purchased, property taxes assessed for that year were unpaid and remained unpaid. A property tax lien attached to the property as of January 1, 1973, pursuant to a statutory provision similar to Section 7–38–48. The lien was not extinguished until the county paid the taxes at a tax sale in 1974. Defendant subsequently bought the property from the county at a public auction in 1977. The trial court found that plaintiff held superior title, and defendant appealed. The appellate court, however, reversed the trial court on the basis that New York's Recording Act did not apply. Therefore, despite the fact that plaintiff's purchase and subsequent recording of his deed were undertaken without notice of a tax lien (recording as well as the absence of notice were required under New York's provision), defendant prevailed. 432 N.Y.S.2d at 918.

The court reasoned:

[T]he tax lien, as a creature of statute and not a conveyance evidenced by a written instrument ... was not embraced by the recording act which relates solely to conveyances * * *. Consequently, even though the lien was never recorded, it could not be cut off by the subsequent attempted purchase of the property by plaintiff and his prompt recording of his deed * * *. Under these circumstances, the interest prior in time, i.e., the tax lien, must be first in right and prevail over the later attempted conveyance of the land to plaintiff * * *.

*Id.* at 918.

Similarly, in this case, we conclude that the tax lien is not within the class of written instruments governed by the Act. The lien could not be extinguished on that basis by an attempted purchase prior to, and outside of, the tax sale. Where the Act has no application, the interest prior in time prevails, and the party claiming under that interest acquires superior title. *Id.* The tax lien, arising in 1976, was prior in time to Lovato's 1980 interest. Therefore, if Lovato purchased before the tax sale, the Canos prevail as the party claiming title under the state's tax lien.

No evidence was introduced, however, regarding the time of the purchases on September 30, perhaps because the relevance of the sequence, admittedly, was not readily apparent. Resolution of the title question requires a remand for the taking of additional evidence to determine whether Lovato executed the real estate contract before or after the sale of this specific property to the Canos. If it is determined that Lovato executed after the Canos purchased, Lovato prevails on his claim of superior title, and the right of possession. In that event, the other issues litigated between all parties, which arise from the finding that the Canos hold superior title, become moot.

We recognize that the result which we reach today may seem inequitable if the tax sale occurred prior to the execution of

the Lovato/Estate contract. In that event, we have held that Lovato would have a superior claim to the property because he entered a real estate contract without notice of the Canos' unrecorded deed. Clearly, the Canos could not have recorded the deed because the deed had not been delivered to them, and we have held that the Division is not required to deliver a deed immediately to a tax sale purchaser. While our result may seem unjust, we simply are not empowered to read into Section 7–38–70 a requirement which is not there. *See Smith v. Village of Corrales,* 103 N.M. 734, 713 P.2d 4 (Ct.App.1985).

Notwithstanding the results of the fact-finding, we will proceed to address the other issues presently on appeal. Should the Canos prevail because Lovato purchased before the tax sale, these issues would necessarily arise in any subsequent proceeding before this court. The interest of time and economy mandates their consideration.

### C. Constitutional Notice

Lovato and the Estate seek, alternatively, to invalidate the tax sale on the basis that they were entitled to, but did not receive, constitutionally adequate notice of the sale. They claim that the failure to give such notice constituted a violation of due process, relying upon *Mennonite Board of Missions v. Adams,* 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983).

In *Mennonite,* Elkhart County, Indiana, instituted proceedings to sell a mortgagor's property for nonpayment of taxes by the mortgagor. In conducting a tax sale, pre-1980 Indiana law required notice by certified mail to the "owner" (mortgagor) of the property, as it did in regular foreclosure sales, but did not provide for such notice by mail or personal service to a mortgagee of the property. Accordingly, only the mortgagor in *Mennonite* was notified by certified mail. The county posted and published an announcement of the proposed tax sale. The mortgagee (Mennonite Board of Missions) was totally unaware of the pending sale, and neither it nor the mortgagor appeared at the sale. The property was

sold, and the two-year statutory redemption period ran before the mortgagee finally learned that the property in which it had an interest had been sold. The purchaser at the sale brought suit to quiet title. The mortgagee defended with the contention that it had not received constitutionally adequate notice and had not received due process. *Id.* at 792–95, 103 S.Ct. at 2708–10. The mortgagee's name was listed in the mortgage, which was filed in the Indiana County Clerk's office. *Id.*

The Supreme Court cited *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), and reemphasized that prior to an action which affects an interest in life, liberty or property protected by the Due Process Clause of the Fourteenth Amendment, a state must provide notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Mennonite,* 462 U.S. at 795, 103 S.Ct. at 2709–10. The court held, in deciding for the mortgagee, that notice "by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party [emphasis in original], whether unlettered or well versed in commercial practice, *if* its name and address are reasonably ascertainable." *Id.* at 800, 103 S.Ct. at 2712. (Emphasis added.)

 Lovato, using *Mennonite,* argues that Section 7–38–70(B) is unconstitutional as applied to him on the facts of this case. Lovato received no notice by mail, nor had any actual knowledge of the pending sale. However, as distinguished from the mortgagee in *Mennonite,* Lovato did not possess an of-record interest at the time of the tax sale. The basis for the reasonable ascertainability of the mortgagee's interest in *Mennonite* was the recordation of its interest. The court did point out that, by its holding, it was not suggesting "that a governmental body is required to undertake extraordinary efforts to discover the identity and whereabouts of a mortgagee

whose identity is not in the public record." *Id.* at 798, n. 4, 103 S.Ct. at 2711 n. 4. We would view any efforts by the Division to go beyond the county clerk's record in order to ascertain Lovato's interest as extraordinary, absent actual knowledge on the part of the Division of his interest not appearing of record. No evidence was presented that the Division had actual knowledge of Lovato's interest. On this basis, the holding of *Mennonite* does not apply to Lovato.

Lovato further argues that another "proceeding" which "adversely affected" his property interest was the belated delivery of the tax deed. He contends that because his contract was of record as of October 9, 1980, the Division, before issuing the deed, should have informed him of its delivery to the Canos. This "belated delivery," however, did not deprive him of a property interest. As we have discussed, the tax sale was the "proceeding" which adversely affected his interest. It is, therefore, the tax sale which was the proceeding of importance for notice purposes.

■■■ The Estate argues that, because Niven S. Robinson was deceased, reasonable further inquiry was required to ascertain the identity of one or more living interested persons to whom notice might be given. *See Klinger v. Kepano,* 64 Haw. 4, 635 P.2d 938 (1981). Notice was mailed to "Robinson, Niven, Etux [sic]" to an incorrect address in Albuquerque. "Et ux" is the equivalent of "and wife." *Black's Law Dictionary* 497 (5th ed. 1979). The address was taken from the Bernalillo County tax schedule. The return of the notice to the Division indicating an incorrect address did not invalidate the sale under Section 7–38–66(C). The Estate argues, however, that for due process purposes, the Division should have next consulted the county probate records to determine the representatives of the Estate. The Estate ignores the fact that no evidence was offered which put the Division on notice that Robinson was deceased. By contrast, in *Klinger,* the Supreme Court of Hawaii held a tax deed invalid against certain defendants where the county treasurer had actual notice of

the death of the property owner, and notice of the address of a living person designated to receive any correspondence for tax purposes, and failed to mail notice to such person. 635 P.2d at 940–41. Moreover, the Estate does not point to any evidence of death ascertainable through the county clerk's records. The clerk's record contains a prior real estate contract on which Robinson was the vendee. The contract lists his address as the same address on the tax schedule. Under these circumstances, we view any effort at determining an interest through the probate records as an "extraordinary effort" outside the scope of *Mennonite.*

The Estate, alternatively, urges this court to remand and order an evidentiary hearing to develop "the full facts as to the basis upon which the state *could* have ascertained their [the parties'] identity for tax sale notice purposes" (emphasis added). Even if we were to assume that such evidence would be relevant, the Estate was not foreclosed from presenting such evidence at the trial on December 5, 1983, almost six months after the *Mennonite* decision. We will not now remand for an additional hearing when the opportunity was presented in the trial court for the introduction of pertinent evidence regarding notice.

Finally, Lovato argues that the code provisions outlining notice are unconstitutional on their face, under *Mennonite.* This argument was not raised below and will not be considered on appeal. *Mwijage v. Kipkemei,* 85 N.M. 360, 512 P.2d 688 (Ct.App. 1973). We express no opinion as to the facial validity of the notice requirement of the code for due process purposes. The tax sale and resulting deed may not be invalidated on the basis of allegedly inadequate notice on these facts.

## II. NEGLIGENCE OF N.M. TITLE

N.M. Title argues that the trial court erred in finding it negligent in closing the transaction between the Estate and Lovato and in not finding the Estate wholly negligent for nonpayment of property taxes. N.M. Title challenges, additionally, the

court's determination that its negligence was the proximate cause of the failure to pay the delinquent taxes and the resulting tax sale. The trial court found: (1) N.M. Title acted as a closing agent for Lovato and the Estate and as a securer of title insurance for the property; (2) in the performance of a tax search, and as a closing agent, N.M. Title should have exercised reasonable diligence and should have been aware of the pending tax auction; (3) N.M. Title should have informed both parties of the pending auction prior to the auction and the closing; and (4) the proximate cause of the tax sale was the lack of diligence on the part of N.M. Title. The trial court concluded that N.M. Title was negligent as closing agent in failing to ascertain the existence of the auction, and failing to insure that delinquent taxes "were or would be paid and such negligence was the proximate cause of the damages suffered by Lovato * * *." The court further concluded that N.M. Title should indemnify the Estate for all sums which the Estate was required to refund to Lovato as a result of the rescission of the real estate contract. On appeal, no party challenges the propriety of the court's rescission of the real estate contract as a result of the tax sale, nor the court's conclusion that Lovato is due back the money he paid under the contract. N.M. Title, however, challenges the conclusion that it should indemnify the Estate for any money paid to Lovato.

We review the findings to determine if they are supported by substantial evidence, *Getz v. Equitable Life Assurance Society of United States*, 90 N.M. 195, 561 P.2d 468 (1977), and all reasonable inferences in support of the findings will be indulged. *Mountain States Construction Co. v. Aragon*, 98 N.M. 194, 647 P.2d 396 (1982). There is no dispute on appeal that N.M. Title was the closing agent for the Estate and Lovato, and was, additionally, to prepare a title insurance policy. No written agreement was apparently utilized between Lovato, the Estate and N.M. Title to create and delineate the scope of the agency. However, the agency relationship need not be evidenced in writing to be given effect. *Vandeventer v. Dale Con-*

*struction Co.*, 277 Or. 817, 562 P.2d 196 (1977). The dispute on appeal revolves around the scope of the duty of N.M. Title. As closing agent, N.M. Title performed, with the consent of both parties, the following acts: (1) receiving and disbursing purchase money at the closing; (2) preparing buyer's and seller's closing sheets prior to the closing; (3) withholding money after the closing to pay for items such as outstanding property taxes and recording fees; (4) examining title before closing and between the date of closing and the date of recording of the real estate contract; and (5) recording the real estate contract. In the performance of these duties, N.M. Title was an agent for both the Estate and Lovato. *Collins v. Heitman*, 225 Ark. 666, 284 S.W.2d 628 (1955). As such, a fiduciary relationship between N.M. Title, Lovato and the Estate existed. *See Barber's Super Markets, Inc. v. Stryker*, 84 N.M. 181, 500 P.2d 1304 (Ct.App.1972); *Colegrove v. Behrle*, 63 N.J.Super. 356, 164 A.2d 620 (1960). This relationship obligated N.M. Title to exercise ordinary care, or reasonable diligence, to communicate to both Lovato and the Estate knowledge acquired in the course of its agency with respect to matters pertaining thereto. *Spaziani v. Millar*, 215 Cal.App.2d 667, 30 Cal.Rptr. 658 (1963); *State Automobile & Casualty Underwriters v. Salisbury*, 27 Utah 2d 229, 494 P.2d 529 (1972); *see Pittard v. Four Seasons Motor Inn, Inc.*, 101 N.M. 723, 688 P.2d 333 (Ct.App.1984).

N.M. Title argues that it was given no instructions concerning payment of taxes prior to closing, and that payment of delinquent taxes was not a condition precedent to closing. N.M. Title also argues that it had no policy of requiring its personnel to advise parties of any tax delinquency, and that it was unaware of any such policy amongst title companies. Adherence to an "industry standard" is not conclusive, however, on the issue of negligence; N.M. Title was obligated to use reasonable care under the circumstances. *Walker v. L.G. Everist, Inc.*, 102 N.M. 783, 701 P.2d 382 (Ct. App.1985). It is undisputed that N.M. Title performed a search of county tax records

on two occasions: July 23, 1980, and September 29, 1980. Both of these searches revealed delinquent taxes dating back to 1976, and the second search revealed that the property had been transferred to the Division for collection. N.M. Title did not notify the parties of either development. The employees of N.M. Title involved in the transaction testified that they were aware, furthermore, that the state conducted sales of property for the collection of delinquent taxes. The tax searcher who noticed the "transfer for collection" notation did not convey this information to the main office and admitted she did not "pay any attention to it at all." Additionally, N.M. Title admitted that, prior to the auction, it received a list of properties due for sale, which list contained the property in question. No notification was given to Lovato and the Estate, apparently because the list was not checked.

In the course of preparing for the closing, and in specifically preparing the "Seller's Closing Statement" which earmarked funds for the payment of the delinquent taxes, N.M. Title had acquired information which it knew could affect the status of the property being closed. N.M. Title took no action to further investigate, or to inform the parties of delinquent taxes, the transfer for collection, and the possibility of the tax sale. It was under a duty to communicate this information. *Spaziani.*

There was, therefore, substantial evidence to support a finding of a breach of duty to use ordinary care. We recognize that the trial court, in its conclusion, imposed a duty on N.M. Title to pay the taxes itself prior to closing. We disagree with that characterization of the duty. The duty was one of communication regarding relevant information. The trial court's conclusion is not binding upon us. *Trigg v. Allemand,* 95 N.M. 128, 619 P.2d 573 (Ct. App.1980). The conclusion is not, however, reversible error because the trial court arrived at the correct conclusion, i.e., a breach of duty, for the wrong reason. *Holmes v. Faycus,* 85 N.M. 740, 516 P.2d 1123 (Ct.App.1973).

As to the issue of proximate cause, we again accept all reasonable inferences to support the findings and conclusions. The proximate cause of an injury is that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, and without which the injury would not have occurred. *New Mexico State Highway Department v. Van Dyke,* 90 N.M. 357, 563 P.2d 1150 (1977). There is substantial evidence, in the present context, to support the trial court's findings and conclusions that the sale of the property for taxes constituted the injury to Lovato and the Estate, from which all subsequent damages flowed. N.M. Title's breach of its duty to communicate (1) the existence of delinquent taxes, (2) the transfer of the account for collection, and (3) the pending tax auction deprived the parties of an opportunity to cure the delinquency prior to the sale, and thereby prevent the sale. *See* § 7–38–66(D). It was reasonable for the court to infer that the parties, absent this breach of duty, would have taken steps to prevent the sale. *See Sanders v. Atchison, Topeka & Santa Fe Railway Co.,* 65 N.M. 286, 336 P.2d 324 (1959). There was substantial evidence to support the trial court's findings and conclusions on this issue.

Based on substantial evidence to support the trial court, we do not consider N.M. Title's argument that the proximate cause of the tax sale was the failure of Niven Robinson, and the Estate after his death, to pay the property taxes when they came due. *Getz; Mountain States.*

### III. MEASURE OF ESTATE'S DAMAGES

■ The Estate argues that the trial court failed to award its full measure of damages. The Estate describes its full measure of damages as its loss of contract rights, occasioned by the rescission of the real estate contract. The trial court awarded the Estate $12,000.00 against N.M. Title as reimbursement for the money the Estate was required to refund to Lovato. The Estate maintains, however, that because it may not regain the property under the tax sale, it is properly due an additional $16,-000.00, which represents the difference be-

tween the total purchase price under the real estate contract and the reimbursement figure. The Estate points out that it did request a conclusion of law for damages based on the total purchase price after trial on the merits.

From the beginning of its participation in the lawsuit, the Estate prayed only for indemnification against N.M. Title and never asserted, until after trial, an independent measure of damages based on the loss of the purchase price. At trial, the Estate never argued to the court a new measure of damages. Therefore, it was not error for the trial court to refuse the Estate's conclusion of law because it related to a measure of damages that had not been litigated before the trial court. *In re Will of Skarda*, 88 N.M. 130, 537 P.2d 1392 (1975). This issue will not be considered on appeal. *Id.*

We recognize that after this appeal was filed, the Estate requested a remand to the trial court for what the Estate termed a "correction" of the judgment to reflect its "full" measure of damages. In denying the remand, this court ordered that the Estate could brief the issue of the trial court's asserted failure to grant full relief. We did not, however, by the express terms of that order, foreclose our resolution of the Estate's argument on the basis that it was not properly raised below.

CROSS–APPEAL

The Canos, on cross-appeal, challenge the court's imposition of an equitable lien on the property, in favor of Lovato, for the fair market value of improvements Lovato placed upon the property prior to the time he was served with a summons in the original ejectment action in Metropolitan Court. This issue was preserved below. The Canos argue, first, that the tax deed, under the provisions of Section 7–38–70(B), conveys the former owner's interest "subject only to perfected interests in the real property existing before the date the property tax lien arose." The Canos contend that the deed extinguishes any existing liens on the property which were not perfected before 1976, the year in which the property tax lien arose. We do not dispute this. The Canos misapprehend, however, when the lien in favor of Lovato arose.

The trial court's imposition of the lien was pursuant to the "betterment" statutes, NMSA 1978, Sections 42–4–14 to –19. Section 42–4–17 is the applicable statute in the present context, and it provides:

When any person or his assignors may have heretofore made, or may hereafter make any valuable improvements on any lands, and he or his assignors have been or may hereafter be deprived of the possession of said improvements in any manner whatever, he shall have the right, either in an action of ejectment which may have been brought against him for the possession, or by an appropriate action at any time thereafter within ten years, to have the value of his said improvements assessed in his favor, as of the date he was so deprived of the possession thereof, and the said value so assessed shall be a lien upon the said land and improvements, and all other lands of the person who so deprived him of the possession thereof situate in the same county, until paid; but no improvements shall be assessed which may or shall have been made after the service of summons in an action of ejectment on him in favor of the person against whom he seeks to have said value assessed for said improvements.

Color of title is required in order for the dispossessed to come under the operation of this statute. *Speartex Grain Co. v. West*, 98 N.M. 91, 645 P.2d 447 (Ct.App. 1982). The real estate contract between the parties provides color of title. The statute mandates that a lien for the value of improvements arises at the time when the value is assessed in favor of the non-owner in an action brought by the non-owner or by the owner. The lien runs from that time, and does not arise at the time the improvements are placed upon the land.

To subject the tax deed to operation of this subsequent lien is not in conflict with Section 7–38–70(B). The statute does not, by its express terms, extinguish liens arising against the property *after* the issuance of the tax deed. Moreover, we would be interpreting the section in an unreasonable manner, which we cannot do, *State v. Santillanes*, 99 N.M. 89, 654 P.2d 542 (1982), were we to suggest that liens could not, in

the future, arise against property held under a tax deed. We would foreclose an avenue of security for those performing services upon the property. In the present case, we would be allowing the Canos to be unjustly enriched for the improvements placed upon the land by Lovato. The trial court did not err in imposing the lien.

We must further decide the proper amount of the lien, which is the Canos' second issue on cross-appeal. The trial court, in its order, granted a lien in the amount of $37,500.00. This amount represents the fair market value of the following improvements undertaken by Lovato: $20,-000.00 for a double-wide trailer; $10,000.00 for a double-wide roof and shelter; and $7,500.00 for detached buildings. The parties agree that these figures represent the amount the improvements have enhanced the value of the land.

The actual cost to Lovato for placing these improvements on the land is different. The Canos argue that this is the proper method of valuing the lien. The supplemental findings and conclusions list this cost but, as we pointed out earlier, these findings and conclusions are a nullity. We need not remand for a new finding, however. The cost to Lovato, excluding any improvements placed on the land after he received a summons in the ejectment action, Section 42–4–17, appears undisputed from the record. Under these circumstances, we may "supply" the findings. *Boddy v. Boddy*, 77 N.M. 149, 420 P.2d 301 (1966). The cost is: two mobile trailers, $18,000.00; concrete footings, roof structure, and other construction costs, $4,961.21; and other miscellaneous improvements, $361.35. Lovato paid $10,000.00 for the trailer he brought on to the property, and paid $8,000.00 out of the real estate contract price for the trailer on the property. The parties consistently refer to this latter figure, and we presume they derive it from the real estate contract, where Lovato agreed to insure for the trailer for the amount of $8,000.00.

The *Restatement of the Law of Restitution* § 42 comment on subsection (1)(c) (1937), states that, where the improver is permitted to recover for the improvements, "he is entitled to the reasonable value of his labor and materials or to the amount which his improvements have added to the market value of the land, whichever is smaller." The reasoning behind this approval was presented in *Madrid v. Spears*, 250 F.2d 51, 54 (10th Cir.1957), where the court stated that the "test of recovery is not how much the owner is enriched by the improvements, but how much he is unjustly enriched. And, the owner is not unjustly enriched more than the improver's cost." *See also Moore v. Sterling Warner Industrial Investment Corp.*, 114 N.H. 520, 323 A.2d 581 (1974); *Taylor v. Balch Land Development Corp.*, 6 Wash.App. 626, 495 P.2d 1047 (1972). We agree with the reasoning of *Madrid*, and adopt it.

The trial court erred in imposing a lien totalling $37,500.00. Should the trial court, after fact-finding, determine that the Canos have superior title, the original judgment must be corrected to impose a lien totalling $23,322.56. Lovato requested no findings as to the value of his labor, and we will not consider this element on appeal. *See McNabb v. Warren*, 83 N.M. 247, 490 P.2d 964 (1971).

We note that several changes appear in the "supplemental" findings, conclusions and judgment that, apparently, were typographical in nature, or inadvertently omitted from the original findings, conclusions and judgment. On remand, we direct the trial court to correct the original findings, conclusions and judgment to incorporate these changes. *See* NMSA 1978, Civ.P.R. 60(a) (Repl.Pamp.1980).

The case is remanded for the limited fact-finding specified in Section I(B). With the exception of the amount of the lien, the judgment is conditionally affirmed as to the issues raised in Section I(A), I(C), II, III and the cross-appeal. The parties will bear their respective costs on appeal.

IT IS SO ORDERED.

DONNELLY and BIVINS, JJ., concur.